**SO ORDERED.**

**SIGNED November 8, 2019.**



_____
**JOHN W. KOLWE**
**UNITED STATES BANKRUPTCY JUDGE**
_____

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| In re:<br>PADCO Energy Services, LLC<br>    *Debtor* | Case No. 16-51380<br>Chapter 11<br>Judge John W. Kolwe |
| PADCO Energy Services, LLC,<br>    *Plaintiff*<br>v.<br>Case Energy Services, LLC, and<br>Spartan Flow Control Services, LLC,<br>    *Defendants* | Adv. Proc. No. 17-5002 |
| PADCO Energy Services, LLC,<br>    *Plaintiff*<br>v.<br>Case Energy Services, LLC, and Jason<br>Farnell,<br>    *Defendants* | c/w Adv. Proc. No. 17-5006 |
| PADCO Pressure Control, LLC,<br>    *Plaintiff*<br>v.<br>Case Energy Services, LLC, and Jason<br>Farnell,<br>    *Defendants* | c/w Adv. Proc. No. 17-5007 |

# RULING ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Before the Court are two virtually identical motions for partial summary judgment by PADCO Energy Services, LLC ("PES") and PADCO Pressure Control, LLC ("PPC"), seeking to dissolve 35 liens filed by Defendant, Case Energy Services, LLC ("Case"), on the grounds that the liens are invalid under state law. For the reasons set forth below, the Court will grant both motions.[1]

## I. Background

This dispute arises out of the bankruptcies of PES and PPC (sometimes collectively referred to as "PADCO" or "Plaintiffs"), both of which filed for bankruptcy protection on October 4, 2016 (Docket Nos. 16-51380 and 16-51381, respectively). PES and PPC filed these adversary proceedings while operating as debtors-in-possession, and the cases were consolidated for trial purposes. Thereafter, their bankruptcy cases were converted to Chapter 7, and Elizabeth G. Andrus was appointed the Chapter 7 Trustee. The Trustee succeeded to the rights of the Plaintiffs in these cases, and she retained PADCO's attorney as her attorney.

The motions before the Court concern two of these three consolidated adversary proceedings (Docket Nos. 17-5006 and 17-5007), in which PES and PPC filed Complaints against Case and Jason Farnell. The Complaints allege that PPC, an affiliate of PES, was formed by PES's principal Michael Carr (holding a 60% interest) and Farnell (holding a 40% interest). The intention was for Farnell to run the day-to-day operations of PPC. The Complaints allege that Carr discovered a potentially suspicious relationship between Farnell and Case that Plaintiffs claim caused Case to overbill PPC by $522,769.69, and that PPC overpaid Case on the amount that Case rightfully should have billed. PPC is seeking damages in the amount of $95,634.75 for the overpayment.

Case apparently did not think it had been overpaid, or paid at all, because the Complaints further allege that Case made written demand on PADCO for payment

---

[1] The Court has jurisdiction to hear this core proceeding concerning the "validity, extent, or priority of liens" pursuant to 28 U.S.C. § 157(b)(2)(K) and Fed. R. Bankr. P. 7001(1).

of $1,236,122.69 in unpaid invoices. The Plaintiffs also allege that beginning on May 4, 2016, Case filed liens on a number of oil and gas wells in Louisiana and Texas, each in the amount of more than $1,200,000.00, allegedly for sums due to Case by PADCO. The Plaintiffs claim these liens are invalid under state law and that their filing caused them to sustain damages from the loss of business and customers. The Plaintiffs also contend they incurred cash flow problems due to operators escrowing amounts owed to the Plaintiffs in response to the liens.[2] The Plaintiffs seek dissolution of all the liens filed by Case, and damages and attorneys' fees under the Louisiana Unfair Trade Practices Act, La. R.S. § 51:1401, *et seq.*

Case answered the adversary proceedings by generally denying all allegations and asserting a crossclaim against the Plaintiffs that is essentially identical to a lawsuit Case had filed against the Plaintiffs and others in Louisiana state court on June 14, 2016, which was stayed upon the Plaintiffs filing bankruptcy. Case is seeking to collect the unpaid invoices and to enforce each of the liens to secure payment of the invoices.

PES and PPC filed these Motions for Partial Summary Judgment (ECF #30 and #31) shortly after filing these adversary proceedings. The Plaintiffs seek dissolution of all of Case's liens—25 in Louisiana and 10 in Texas—on the grounds that they are not valid under either the Louisiana Oil Well Lien Act, La. R.S. § 9:4861, *et seq.* ("LOWLA"), or Chapter 56 of the Texas Property Code. The Plaintiffs claim the Louisiana liens are invalid under LOWLA because: (i) Case did not deliver any materials to, or provide any services at, a well site; (ii) the liens do not "fairly apprise" the Plaintiffs of the materials allegedly incorporated into the well, and the exact costs of those materials; (iii) the Plaintiffs did not owe Case any amounts when the liens were filed; and (iv) the liens were not timely filed. Initially, the Plaintiffs asserted

---

[2] PADCO's contends: "Upon the filing of the Liens, the business of both PES and PPC with the operators of the 35 wells was totally disrupted, with payment on invoices for services already rendered being escrowed and the complete cessation of any future business between PPC/PES and the entities that operated the liened wells, which resulted in severe and extensive cash flow problems that resulted in the bankruptcies of both PPC and PES." *See* PADCO's Statement of Uncontested Facts, ¶ 26 (ECF # 30-3).

similar grounds to invalidate the Texas liens; however, they supplemented their motion and now primarily argue that the Texas liens are invalid because of an inadequate property description. Case opposes the motions on the basis that material issues of fact exist.

At the outset, the Court finds that material issues of fact exist with respect to whether the Plaintiffs owe any amounts to Case, and whether the liens were timely filed (items (iii) and (iv) in the preceding paragraph).[3] Accordingly, the Plaintiffs' motions on those grounds are denied. However, the Plaintiffs need only prevail on one of their other remaining grounds (or on any facially apparent legal ground) to invalidate any given lien. For the reasons set forth below, the Court finds that both the Louisiana and Texas liens are invalid. Accordingly, the Plaintiffs' Motions for Partial Summary Judgment will be granted.

## II. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 is applicable to adversary proceedings. *See* Fed. R. Bankr. P. 7056. The movant's initial burden is "'to demonstrate that no genuine issue of material fact exists.'" *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009), *aff'd sub nom.*, *Sossamon v. Texas*, 563 U.S. 277, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011) (quoting *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005)); *see also* LR56.1. If the movant satisfies that initial burden by establishing the "'absence of evidence to support an essential element of the non-movant's case, the burden shifts to the party opponent to establish that there is a genuine issue of material fact.'" *Id.* A genuine dispute of

---

[3] With respect to the amounts due, on the one hand, PADCO contends (based on the affidavit of its owner, Michael Carr) that it did not owe any amounts to Case at the time the liens were filed, while Case contends it was owed in excess of $1,200,000 at the time the liens were filed, producing invoices to support its claim. Also, LOWLA provides that the 180-day deadline to file a statement of privilege runs from the day of the last activity at the well site giving rise to the privilege. PADCO looks primarily to the invoice dates to argue that the liens were not filed timely. Case points out that the correct standard is the date of last activity and contends additional discovery would be necessary to establish those facts. Given the obvious factual disputes on these issues, PADCO's Motion for Partial Summary Judgment on these grounds must be denied.

4

material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Supreme Service & Specialty Co., v. Bennu Oil & Gas, LLC (In re ATP Oil & Gas Corporation)*, 550 B.R. 110, 114 (Bankr. S.D. Tex. 2016) ("*ATP*") (citing *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *ATP,* 550 B.R. at 110 (citing *City & Cnty. of S.F., Cal. v. Sheehan*, —— U.S. ——, 135 S. Ct. 1765, 1769, 191 L. Ed. 2d 856 (2015)). But "Rule 56 does not impose upon the . . . court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Stults v. Conoco, Inc.,* 76 F.3d 651, 656 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195, 130 L. Ed. 2d 127 (1994); *see also Nissho–Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. *ATP*, 550 B.R. at 114-15, *citing* Fed. R. Civ. P. 56(c)(1); *see also* LR56.2. "However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment. Finally, a mere scintilla [of evidence] is not enough to defeat a motion for summary judgment." *Carpenter v Wal-Mart Stores, Inc.*, 614 F.Supp.2d 745, 747 (W.D. La. 2008) (citing *Brock v. Chevron U.S.A., Inc.,* 976 F.2d 969, 970 (5th Cir. 1992); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1086 (5th Cir. 1994) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)) (internal quotation marks omitted, alteration in *Carpenter*)).

5

<u>**III. Law and Analysis**</u>

**A.    The Louisiana Liens**

With the elimination of two of PADCO's grounds for dissolution of Case's liens for the reasons stated above, PADCO sets forth two remaining grounds for canceling Case's Louisiana liens. First, it claims that Case has no legal right to a lien under LOWLA because Case's equipment was not delivered to a well site or incorporated into a well or a facility located on a well site. Second, it claims that Case's statements of privilege, which were filed in the mortgage records in the parishes where the wells are located, do not comply with LOWLA because they do not fairly apprise the recipient of the privilege claimed, or the precise amount owed for the equipment allegedly incorporated into each well. Each of these grounds will be examined below.

In performing this analysis, the Court notes that in Louisiana "[p]rivileges, which often derogate the rights of innocent parties, are construed strictly. When in doubt, [the court should] decline to find a privilege." *Amoco Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 148 (5th Cir. 1992) (bracketed material added); *see also Guichard Drilling Co. v. Alpine Energy Servs., Inc.*, 657 So. 2d 1307, 1313 (La. 1995) ("As a general rule, lien statutes are stricti juris and should thus be strictly construed.").

**1.    Does LOWLA Provide a Privilege to Case Based on the Uncontested Facts?**

**a.    The Relevant Provisions of LOWLA.**

Key to understanding LOWLA's scope and application are the definitions set forth in the statute. Indeed, "the definitions, in most respects, define and limit the rights granted under the statute." Patricia H. Chicoine, *Lien on LOWLA: It's a Privilege: Recent Revisions to the Louisiana Oil Well Lien Act*, 57 La. L. Rev. 1133, 1136 (1997). Relevant here are the following definitions:

> (1) A "claimant" is a person who is owed an obligation secured by the privilege established by R.S. 9:4862.

* * *

6

(4) (a) "Operations" are every activity conducted by or for a lessee on a well site for the purpose of:

> (i) Drilling, completing, testing, producing, reworking, or abandoning a well.

> (ii) Saving, treating, or disposing of hydrocarbons or other substances produced from a well.

> (iii) Injecting substances into the earth to produce or enhance the production of hydrocarbons.

* * *

(6) A "lessee" is a person who owns an operating interest.

(7) An "operator" is a lessee who is personally bound by contract to the claimant or to a contractor from whom the claimant's activities giving rise to the privilege emanate.

* * *

(10) A "contractor" is a person, other than a lessee, who contracts with an operator to perform the operations giving rise to the claimant's privilege or who, by subcontract with a contractor of the operator or through a series of subcontracts emanating from such a contractor, contracts to perform all or part of the operations contracted for by the operator.

* * *

(12) A "well site" is the area covered by:

> (a) The operating interest.

> (b) A unit in which the operating interest participates.

> (c) A tract of land or the area covered by a servitude or predial lease of the lessee on which is located a well drilled to, producing from, or injecting substances into the area covered by the operating interest.

La. R.S. § 9:4861.

7

These defined terms are used in La. R.S. § 9:4862 to identify both the activities giving rise to a privilege and the persons entitled to claim that privilege:

A. The following persons have a privilege over the property described in R.S. 9:4863 to secure the following obligations incurred in operations:

(1) A contractor for the price of his contract for operations.

(2) A contractor for the price of his contract for providing services or facilities to persons performing labor or services on a well site located in the waters of the state.

(3) A laborer or employee of an operator or contractor, for the price of his labor performed at the well site.

(4) A person who performs trucking, towing, barging, or other transportation services for an operator or contractor, for the price of transporting movables to the well site.

(5) A person who transports, to or from a well site located in the waters of the state, persons who are employed in rendering labor or services on the well site, for the price of transporting those persons.

(6) A seller for the price of a movable sold to an operator or contractor that is:

(a) Incorporated in a well or in a facility located on the well site.

(b) Consumed in operations.

(c) Consumed at the well site by a person performing labor or services on a well site located in the waters of the state.

(7) A lessor for the rent of a movable leased to an operator or contractor used in operations and that accrues while the movable is located on the well site. . . .

8

La. R.S. § 9:4862(A).

The Court makes several observations with respect to these provisions and their application to these cases. First, under §§ 4861 and 4862(A) a person must generally be actively engaged in providing services or materials in connection with "operations" in order to claim a privilege under LOWLA. *See* Chicoine, 57 La. L. Rev. at 1143. Since "operations" are limited under § 4861 to activities "conducted by or for a lessee on a well site," activities conducted away from the well site generally do not give rise to a privilege under LOWLA. *See In re ATP Oil & Gas Corporation*, 550 B.R. at 117-118, *citing J. Ray McDermott, Inc. v. Berry Contracting, L.P.,* 2004 WL 224583, at *8 (E.D. La. Feb. 3, 2004) (determining that the contractor "may only assert a LOWLA lien in its capacity as a contractor under that statute to the extent it performed operations, which by definition must have been on the well site"); and *Matte Services Corp. v. ONYX Consulting Engineers, LLC* 2007 WL 1087592 at *3 (E.D. La. April 10, 2007) (holding that "[t]he plain and clear language of LOWLA limits the scope of the privilege to persons who perform services on a well site. . . .").

Second, §§ 4861 and 4862(A) taken together confirm that there generally is no "right of a furnisher of a furnisher (or a supplier of a supplier) to successfully claim a privilege unless such furnisher and suppliers fall within the definition of 'contractor' or, in the alternative, qualify as a 'seller . . . to an operator or contractor' of movables either incorporated at the well site or consumed in operations thereof." Chicoine, 57 La. L. Rev. at 1144 (quoting from La. R.S. § 9:4862(A)(6); footnotes omitted)[4]; *see also Wilson Industries, Inc. v Aviva America, Inc.*, 185 F.3d 492 (5th Cir. 1999) (analogizing to the Public Works Act, La. R.S. § 38:2241 *et seq*. to conclude that under LOWLA, a mere supplier of materials to an operator is not a "contractor" and that a supplier to the supplier cannot assert a privilege under LOWLA).

Third, a "lessor" to an operator or contractor who does not perform any operations at the well site is not a "contractor" under the wording of § 4862(A), which

---

[4] "Furnishers of furnishers" and "suppliers of suppliers" refer to "those who furnish or supply materials or equipment, often from a remote site, to those who are the ultimate furnishers and suppliers of materials and equipment to the actual well site." Chicoine, 57 La. L. Rev. at 1135 n. 10.

shows a clear distinction between (a) privileges granted to "contractors," which are established in § 4862(A)(1) and (2) "for the price of his contract for operations" and "for the price of his contract for providing services or facilities to persons performing labor or services on a well site located in the waters of the state," respectively, and (b) a privilege in favor of "[a] lessor for the rent of a movable leased to an operator or contractor used in operations and that accrues while the movable is located on the well site," which is established at the end of the list in § 4862(A)(7). The fact that the drafters of LOWLA included a separate category for lessors who only rent movables to operators or contractors shows that such "lessors" may not necessarily be "contractors" under LOWLA. This is significant, because unlike the carve-out favoring sellers of movables to operators and contractors under § 4862(A)(6), there is no such provision favoring sellers of movables to lessors. Put another way, a person selling movables to a person who only rents movables to an operator or contractor is not entitled to a lien under the straightforward wording of LOWLA.

### b. Uncontested Facts and Analysis

The analysis now turns to whether the summary judgment evidence shows that Case is entitled to a lien under LOWLA. The Court first considers whether Case is entitled to a privilege under § 4862(A)(1) as a "contractor." PADCO states that Case "sold to PPC some of the piping, gauges and valves that were used, along with other sources, to assemble the flowback units," and that Case's equipment was "delivered to PPC's yard location."[5] Case confirmed that: the equipment was "delivered to [PADCO's]. . . yard . . . ," Case "did not perform any service or personally install . . . equipment on the respective well sites, and Case did not have a contract "directly with the well owners or operators."[6] Based on the definition of "contractor" and "operator" above, these facts establish that Case was not a "contractor" under LOWLA because it did not have a contract with the lessee or operator of the wells and it conducted no operations at the well sites. These facts also confirm that Case is

---

[5] *See* PADCO's Statement of Uncontested Facts, ¶¶ 11 and 24 (ECF #30-3).

[6] *See* Affidavits of Cody Thomas, Case's owner, ¶¶ 37 and 42 (ECF #35-4 and 37-1).

not entitled to a lien under § 4862(A)(3) because it did not transport any equipment to or from a well site.

Case must look to other provisions in § 4862(A) to establish a lien under LOWLA. Case solely relies upon § 4862(A)(6), arguing that it is entitled to a privilege under that provision because it sold equipment to a "contractor" (PADCO) that was incorporated in a well or facility located on the well site or consumed there. Case's argument hinges both on whether PADCO was a "contractor" as defined in LOWLA, and on whether the equipment that Case sold to PADCO was "incorporated" into or "consumed" at a well site. If either of these facts is false, then § 4862(A)(6) cannot grant Case a privilege.

### (1) Was PADCO a "Contractor" under LOWLA?

The Plaintiffs' Statement of Uncontested Fact indicates that PPC's and PEC's primary business was the *rental* of flowback units to oil and gas operators:

> 8. PPC's primary business objective was to build and rent flowback units used at well sites in the completion of oil and gas wells.

> 9. The flowback unit is used to monitor the return of fracking fluids from the well bore. It consists of piping, gauges, valves, and plug catchers.

> 10. After construction by PPC, a flowback unit is rented to a well operator and remains on the well site for approximately two weeks to two months, depending on fluid volume.

> \* \* \*

> 12. Upon the return of a flowback unit to PPC after a well's completion, the flowback unit is refurbished, with damaged parts replaced, and then redeployed for use on another well.[7]

These facts suggest that PADCO merely supplied equipment to an "operator" at the well site by constructing the flowback units off-site and then delivering and

---

[7] *See* PADCO's Statements of Uncontested Facts (ECF #30-3 and 31-3) and the Affidavits of Michael Carr, which are attached to the Plaintiffs' Motions (ECF #30-4 and 31-4).

renting them out to the operator for use in operations at the well site. Under these facts PADCO would be a "lessor" of movables under LOWLA, but not a "contractor." This is because the foregoing facts do not indicate that PADCO itself was conducting operations on the well site, which is required for a person to be defined as a "contractor" under the statute. If PADCO were only a "lessor" but not a "contractor," it would have a potential lien under § 4862(A)(7), but not Case because, as noted above, LOWLA does not provide a lien to a seller of movables to a lessor of movables to an operator or contractor for *use* in operations at the well site. In other words, under this scenario, Case would be classified as a supplier to a furnisher and thus not entitled to a lien. *See Wilson Industries, Inc., supra.*

Case, in its Response to PADCO's Statement of Uncontested Facts, offers no evidence in rebuttal to PADCO's assertion that it primarily rents flowback units to operators, and it does not deny these factual assertions by PADCO. Instead, Case generally states, e.g., that each of the above facts are "[a]dmitted only to the extent that PPC was involved in operating an oil and gas well completion service, including flowback services . . . ."[8] Nevertheless, while it is not the Court's "duty to sift through the record in search of evidence to support a party's opposition to summary judgment," *Ragas, supra*, the Court has closely examined the affidavit of Cody Thomas, Case's owner, and finds it contains assertions that PADCO may have been conducting operations at the well sites at issue in this case:

> 22.    Debtors are contractors to the respective well operators.

> * * *

> 26.    PADCO Pressure Control, LLC and PADCO Energy Services, LLC operated an oil and gas well completion service, including flowback service.

> * * *

> 42. [Case] did not perform any service or personally install [Case's] equipment on the respective well sites, as

---

[8] *See* Case's Response to PADCO's Uncontested Facts, pp. 3-4 (ECF #35-1).

> [PADCO] was the contractor to perform those services and [Case] did not have a contract or MSA directly with the well owner[s] or operator[s].[9]

These statements, coupled with Case's Response to PADCO's Statement of Uncontested Facts, show that Case admits (or at least does not deny) that PADCO built and then rented the flowback units to operators, but further asserts that PADCO performed flowback services at the well site. Given PADCO's silence on this issue, the Court finds that under Rule 56's summary judgment standards, a genuine dispute of material fact exists as to whether PADCO actually performed work and services at a "well site." Put another way, the Court cannot conclude that PADCO was only a lessor of flowback units to operators, and not a "contractor" under LOWLA.

That does not end the Court's inquiry. Even if PADCO were a "contractor," Case could only obtain a lien if it met the other statutory requirements under § 4862(A)(6) by establishing that the equipment Case sold to PADCO was either "incorporated in a well or in a facility located on the well site" or "consumed in operations."

### (2) Was the Equipment Sold to PADCO "Incorporated" into a Well or Facility on the Well Site, or "Consumed" There?

Case contends its equipment was incorporated into the well sites or consumed in operations at the well sites identified in its liens. LOWLA does not define the terms "incorporated" or "consumed." We must look to Louisiana's rules for statutory interpretation, set out in La. Civ. Code arts. 9 through 13 (for general statutory interpretation, including the Civil Code), as well as La. R.S. § 1:1-17 (for interpretation of Revised Statutes) for guidance. *See, e.g., Weeks Tractor And Supply Co., LLC v Arctic Cat, Inc.*, 784 F. Supp. 2d 642 (W.D. La. 2011). La. Civ. Code art. 9 provides the general rule: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."

---

[9] *See* Thomas Affidavit (ECF #35-4 and 37-1).

13

However, "[w]hen the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." La. Civ. Code art. 10.

"The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter." La. Civ. Code art. 11. With respect to interpretation of Revised Statutes, like LOWLA in this case, La. R.S. § 1:3 provides:

> Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.
>
> The word "shall" is mandatory and the word "may" is permissive.

*Id*. Finally, La. Civ. Code art. 12 provides that "[w]hen the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole," and La. Civ. Code art. 13 requires that "[l]aws on the same subject matter must be interpreted in reference to each other."

These interpretive rules supply the Court with the tools it needs to determine the meaning of the terms "incorporated" and "consumed," notwithstanding the lack of a specific definition in LOWLA. Indeed, both La. Civ. Code art. 11 and La. R.S. § 1:3 expressly direct the Court to look to the common usage of otherwise undefined terms to determine the proper meaning in the context of a statute.

Applying these rules here, the Court finds that the terms "incorporated" and "consumed" as used in § 4862(A) require something more than a temporary presence of movables on a well site. This is evident when the wording of § 4862(A)(7) is compared to that of § 4862(A)(6). Section 4862(A)(7) provides a privilege to a *lessor of movables* to an operator or contractor "used in operations and that accrues while the movable is located on the well site." This provision recognizes that a movable— equipment—may be located temporarily on a well site while being *used* in a particular

14

operation. It does not require incorporation, because, as leased equipment, it will be returned to the lessor, not incorporated into the well or a facility at the well site.

In contrast, § 4862(A)(6) provides a privilege to a *seller of movables* to an operator or contractor has a lien only if the movable is "incorporated" in a well or facility located on the well site or "consumed" at the well site. These terms connote a permanence, i.e., that the movable sold to the contractor will not be leaving the well site because it either will become a part of the well or facility itself or will be consumed in the operation. Certainly, the LOWLA drafters could have provided the seller of movables a privilege if the movable was only used in an operation at the well site, as opposed to being incorporated into the well. The fact that they did not necessarily means that being "incorporated" into the well or "consumed" in operations requires something more than just being "used" at the well site.

This conclusion is supported by the "common and approved usage" of the terms "incorporated" and "consumed." Ignoring obsolete or irrelevant definitions, the two most relevant definitions of "incorporated" in the Oxford English Dictionary are: "1. United into one body; combined. . . .3. Included as part of a whole."[10] Similarly, Merriam-Webster most relevantly defines "incorporated" as "united in one body," and Dictionary.com defines it as "combined in one body; made part of."[11] Applying these definitions to the term "incorporated" in LOWLA means that in order for a claimant to have a lien under § 4862(A)(6), the supplied movable must be directly joined with the well to become a part of the whole.

The term "consume" has a similar meaning. It is most relevantly defined in the Oxford English Dictionary as "to use up (esp. a commodity or resource), exhaust."[12] Merriam-Webster defines it as "to do away with completely; . . . use up," and

---

[10] *See OED Online*, Oxford University Press, (http://www.oed.com/view/Entry/93963).

[11] *See* Merriam-Webster Online Dictionary (https://www.merriam-webster.com/dictionary/incorporated) and Dictionary.com Online Dictionary (https://www.dictionary.com/browse/incorporated), respectively.

[12] *See OED Online, Oxford University Press (*https://www.oed.com/view/Entry/39973).

Dictionary.com defines "consume" as "to destroy or expend by use; use up."[13] Based on these definitions, for an movable to be "consumed in operations," it must be completely used, or destroyed, in the operation.

Accordingly, the Court finds that the terms "incorporated" and "consumed," as used § 4862(A)(6), mean that movables sold to a contractor must become a permanent part of the well or facility located at the well site, or be completely used up in operations at the well site, for the seller to be entitled to a privilege under the statute.

The Court now turns back to the summary judgment evidence. As noted above, the uncontested facts establish that Case's equipment was delivered to PADCO's yards in Bossier City or Minden, Louisiana, not a well site. That equipment was then utilized in PADCO's yards, along with equipment from other sources, to assemble and construct larger pieces of equipment known as "flowback units." Once constructed, the flowback units were delivered to well sites located in Northwest Louisiana and East Texas, where they were used to monitor the return of fracking fluids from the wellbore.[14] These facts establish that the equipment sold to PADCO by Case was not incorporated directly into a well, or a facility located on a well site. Rather, it was used to assemble and construct a flowback unit in PADCO's yard (away from the well sites), and then rented to an operator by PADCO and delivered to a well site for use in a flowback operation, i.e., the removal of fracking fluid from the wellbore. Without more, these facts do not establish a lien in favor of Case.

The question now becomes whether the flowback unit became "incorporated" into the well or a facility on the well site upon delivery. According to PADCO it was not. PADCO's Statement of Uncontested Fact provides that "after construction by PPC, a flowback unit [was] rented to a well operator and remain[ed] on the well site for approximately two weeks to two months, depending on fluid volume. Upon the

_____

[13] *See* Merriam-Webster Online Dictionary (https://www.merriam-webster.com/dictionary/consume) and Dictionary.com Online Dictionary (https://www.dictionary.com/browse/consume), respectively.

[14] *See* PADCO's Statement of Uncontested Facts, ¶¶ 9-11; 24 (ECF #30-3); *see also* the Thomas Affidavits (ECF #35-4 and 37-1, ¶¶ 27-29; 35-40).

return of a flowback unit to PPC after a well's completion, the flowback unit [was] refurbished, with damaged parts replaced, and then redeployed for use on another well."[15] PADCO states that none of the equipment became incorporated into the well or a well site, and that the operator never acquired ownership of the equipment.[16]

As noted above, Case admits that PADCO was "involved in operating an oil and gas well completion service, including flowback services,"[17] but it flatly denies PADCO's assertion that the flowback units did not become owned by the operators or incorporated into the well or well site.[18] According to Case, "the subject equipment and services were incorporated into the same wells which [Case] filed and recorded its liens against," and "some of the equipment may have been consumed at wells. . . ."[19] This is not sufficient to create an issue of fact on whether the equipment sold to PADCO by Case was incorporated into the well or facility on the well site or consumed by the well. "[U]nsupported affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) (affirming summary judgment on a gross negligence claim because the expert opinions for the plaintiff were conclusory and not supported by sufficient facts); *see also, Carpenter*, 614 F.Supp.2d at 747 ("However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment. Finally, a mere scintilla [of evidence] is not enough to defeat a motion for summary judgment.").

In summary, while the equipment that Case supplied to PADCO was incorporated into the flowback units at PADCO's yard (not at the well sites), the uncontested facts establish that the flowback units were not "incorporated" into a

---

[15] *See* PADCO's Statement of Uncontested Fact, ¶¶ 10 and 12 (ECF #30-3 and 31-3).

[16] *Id.*, ¶¶ 13 and 24.

[17] *See* Case's Response to PADCO's Statement of Uncontested Fact, ¶ 11 (ECF #37-4); *see also*, Thomas Affidavit, ¶ 28 (ECF #37-1).

[18] *See* Case's Response to PADCO's Statement of Uncontested Fact, ¶ 13 and 24 (ECF #37-4).

[19] *See* Thomas Affidavit, ¶¶ 29 and 35.

17

well or facility at a well site or consumed by a well as required by § 4862(A)(6) because they were rented to the operator and thus were only temporarily located at the well site and *used* while flowback operations were conducted. Accordingly, Case cannot obtain a lien pursuant to § 4862(A)(6) (or any other subsection, as the Court already explained). This conclusion alone entitles PADCO to summary judgment on the Louisiana liens, but there is another, independent basis for summary judgment as will be discussed below.

### 2. Do Case's Statements of Privilege Comply with LOWLA?

#### a. Relevant Provisions of LOWLA

The Court next turns to PADCO's contention that Case's statements of privilege are invalid under LOWLA. Under LOWLA, "a privilege ceases to have effect against a third person [180] days after the last activity or event which gives rise to the privilege unless . . . the claimant files a statement of privilege in the mortgage records of the parish where the operating interest subject to the privilege is located." La. R.S. § 9:4865(A)(1). "Third person" is defined by LOWLA as "a person, including a lessee or operator, who is not contractually bound to the claimant for the obligation secured by a privilege or who has not expressly assumed the obligation." La. R.S. § 9:4861(11). Thus, the sole purpose of recording a statement of privilege is to maintain the effectiveness of the privilege as to third persons not contractually bound to the claimant.

LOWLA also provides the required contents of a statement of privilege:

> A. A statement of privilege must be in writing, signed by or on behalf of the claimant, and contain all of the following information:

> (1) The name and address of the claimant.

> (2) The amount and nature of the obligation for which the privilege is claimed.

> (3) The name and address of the person owing such amount.

> (4) The name of the operator of the well as shown by the records of the commissioner of conservation.

18

(5) A description of the operating interest upon which the privilege is claimed, or of the well with respect to which the operations giving rise to the claimant's privilege were performed.

B. (1) A well is adequately identified if the statement of privilege gives the name and serial or other identification number of the well and the name of the field where it is located as these are designated by the records of the commissioner of conservation.

(2) A notice is properly delivered to the operator if it is delivered to the operator who is properly identified in the statement of privilege.

* * *

E. A statement of privilege is not invalid if it fails to contain all of the information required by Subsection A of this Section, but fairly apprises the recipient or person against whom the privilege is asserted of the privilege claimed and of the operating interest, hydrocarbons, or other property upon which the privilege is claimed.

La. R.S. § 9:4868. While Subsection A of § 9:4868 sets forth five items of information that "must" be included in the statement of privilege, Subsection E of the statute contains what is essentially a safe harbor, by providing the statement of privilege is not invalid for failing to include all five items, as long as it "fairly apprises the recipient or person against whom the privilege is asserted of the privilege claimed" and of the "operating interest" or "property upon which the privilege is claimed." Put another way, the statement of privilege, at a minimum, must set forth (i) the identity of the person against whom the privilege is asserted, (ii) the amount and nature of the obligation for which the privilege is claimed, and (iii) the name of the well and the serial or other identification number associated with that well, along with the name of the field where the well is located. *See*, La. R.S. § 9:4868(A)(2), (4), and (5); (B)(1) and (2).

      **b.     Uncontested Facts and Analysis—Do Case's Liens Fairly Apprise Third Parties of the Privilege Claimed?**

PADCO contends Case's statements of privilege are invalid because they do not "fairly apprise" the person against whom the privilege is asserted of the privilege claimed. According to PADCO:

> The "amount and nature of the obligation" requires [Case] to list its parts and how those [parts] became "incorporated" into each well and the portion of [Case's] overall $1.2 million claim that represents the price for those parts. The Liens are each in the amount of $1.2 million, even though [Case] only alleges that $1.2 million is owed *in toto* by [PADCO]. To be valid, the Liens should have contained a description of which part(s) were incorporated into or consumed by each well and the price of the parts so used.[20]

Case filed 25 statements of privilege in Louisiana against 25 separate wells. It is undisputed by the parties that each of these statements of privilege are identical except for the well or property description, and the identity of the operator of such wells, as set forth in each. The relevant portions of the statements of privilege provide:

> 4. In connection with its business, CASE ENERGY SERVICES, LLC contracted to supply oilfield equipment and services including but not limited to furnishing labor, equipment, services and supplies in support of the development, exploration, maintenance and operations, including drilling, completion, testing and production of oil and gas wells to PADCO ENERGY SERVICES, LLC f/k/a PADCO, LLC, PADCO OIL FIELD SERVICES, LLC, PADCO OPERATING, LLC, PADCO PRESSURE CONTROL, LLC, and TRIBAL INDUSTRIES, LLC, which are operated as a single business enterprise for purposes of these matters.
>
> 5. On multiple occasions, CASE ENERGY SERVICES, LLC, supplied oilfield equipment and services including but not limited to furnishing labor, equipment, services and supplies in support of the development, exploration, maintenance and operations, including drilling,

---

[20] *See* PADCO's Memorandum in Support of Motion for Partial Summary Judgement, pp. 8-9 (ECF # 30-2).

completion, testing and production of oil and gas wells to PADCO ENERGY SERVICES, LLC f/k/a PADCO, LLC, PADCO OIL FIELD SERVICES, LLC, PADCO OPERATING, LLC, PADCO PRESSURE CONTROL, LLC, and TRIBAL INDUSTRIES, LLC, in connection with certain oil and gas lease[s], including specifically that certain lease upon which is located the **well identified as the A Duran Estates 17-8 001 [#1H] Well, Serial No. 248584, Lincoln Parish, Louisiana** ["the lease"] and the sum of the value of the equipment and services is more than **one million, two hundred thousand dollars [$1,200,000.00],** as reflected in the statements and invoices, together with supporting documentation, all which has been provided to the principals at PADCO ENERGY SERVICES, LLC f/k/a PADCO, LLC, PADCO OIL FIELD SERVICES, LLC, PADCO OPERATING, LLC, PADCO PRESSURE CONTROL, LLC, and TRIBAL INDUSTRIES, LLC.

6. As of this date, the sums due and owing by PADCO ENERGY SERVICES, LLC f/k/a PADCO, LLC, PADCO OIL FIELD SERVICES, LLC, PADCO OPERATING, LLC, PADCO PRESSURE CONTROL, LLC, and TRIBAL INDUSTRIES, LLC, to CASE ENERGY SERVICES, LLC, **exceed one million, two hundred thousand dollars [$1,200,000.00],** as reflected in the statements and invoices, together with supporting documentation, all which has been provided to the principals at PADCO ENERGY SERVICES, LLC f/k/a PADCO, LLC, PADCO OIL FIELD SERVICES, LLC, PADCO OPERATING, LLC, PADCO PRESSURE CONTROL, LLC, and TRIBAL INDUSTRIES, LLC. These sums do not reflect the attorneys' fees and costs that will be due if a collection lawsuit becomes necessary.

7. At all relevant times hereto, the oilfield equipment and services, including but not limited to furnishing labor, equipment, services and supplies in support of the development, exploration, maintenance and operations, including drilling, completion, testing and production of oil and gas wells provided to PADCO ENERGY SERVICES, LLC f/k/a PADCO, LLC, PADCO OIL FIELD SERVICES, LLC, PADCO OPERATING, LLC, PADCO PRESSURE CONTROL, LLC, and TRIBAL INDUSTRIES, LLC, by CASE ENERGY SERVICES, LLC, were used for or in connection with the drilling, exploration, development and/or operation of oil and gas wells, as follows:

**PARISH: Lincoln Parish, Louisiana.**

**FIELD: Terryville**
**WELL: A Dunn Estates 17-8 001 [#1H] Well, Serial No.**
**248584**
**API #: 17061212450000**
**OPERATOR: MRD OPERATING, LLC**[21]

The Court finds that Case's statements of privilege fail to "fairly apprise" third persons—the operators—of the privilege claimed for two primary reasons. First, the amount claimed in each statement is grossly inflated. The Court notes that each of the 25 Louisiana statements of privilege was asserted in the amount of "more than one million, two hundred thousand dollars" for equipment and services that Case allegedly supplied to PADCO not only on the well described in the statement, but also elsewhere. Thus, each lien on its face sought to cover work that was not relevant to the liened property, because Case asserted the full amount it was owed by PADCO in each lien, when the undisputed facts show less than all equipment was incorporated into a single flowback unit. Given that Case asserted this same amount in all 25 liens, Case placed on the public records of Louisiana, statements of privilege totaling at least $30,000,000.00 based on PADCO's alleged failure to pay a total debt allegedly worth a little more than $1,200,000.00. This is not sufficient to fairly apprise anyone looking at the public record of the actual amount owed to Case for equipment "incorporated" into the well or a facility located on the well site.

Second, the statements of privilege do not describe the privilege claimed. As noted above, the only privilege that Case could possibly have under LOWLA is under § 4862(A)(6), which requires the movables sold to PADCO to Case to be incorporated into the well or a facility located on the well site or consumed in operations at the well site. Case's statements do not include the invoices which describe the movables sold to PADCO. Nor do they include any other descriptions of the movables allegedly incorporated into the well or consumed at the well site. Each Case lien only states

---

[21] *See* ECF # 30-7 (emphasis in original).

that Case provided "labor, equipment, services and supplies in support of the development, exploration, maintenance, and operations . . . ."[22]

Case claims LOWLA does not require more precision in its statements of privilege. The Court disagrees. As noted above, LOWLA, in § 4868(E), sets forth the bare minimum that must be included in the statement of privilege for it to be valid. Although Case's statements appear to comply with the requirement that the property over which the privilege is claimed be described, they clearly do not fairly apprise the third persons, i.e., the operators, of the equipment that was sold to PADCO, how that equipment was incorporated into or consumed at the well site, or the precise cost of the equipment allegedly incorporated into each well site.

Simply put, the statements of privilege are invalid and subject to cancellation on the public records because they do not satisfy the requirements of § 4868(E).

### 3. Case's Louisiana Liens Are Invalid for Two Reasons.

In short, PADCO is entitled to summary judgment declaring all 25 Louisiana liens invalid as a matter of law because (i) the movables sold to Case by PADCO were not "incorporated" into a well or facility located on the well site, or consumed in operations at the well site, as required under La. R.S. § 9:4862(A)(6), and (ii) Case's statements of privilege do not "fairly apprise" third persons of the nature of the privilege claimed, and the precise amount owed for the movable allegedly supplied to each well as required under La. R.S. § 9:4868.

## B. The Texas Liens

### 1. The Texas Lien Framework

In Texas, "[s]tatutory liens against mineral property are governed by Chapter 56 of the Texas Property Code. Tex. Prop. Code Ann. § 56.001, *et. seq.* In order to secure a lien against mineral property, a lien claimant must file an affidavit with the county clerk of the county in which the property is located. *Id.*" *In re Reichmann Petroleum Corp.*, 2009 WL 915280 (S.D. Tex. 2009), *affirmed*, 373 Fed. Appx. 497 (5th Cir. 2010). "The purpose of [Chapter] 56 of the Property Code is not only to give a lien

---

[22] *See* ECF # 30-7.

to a party who furnishes materials, supplies, or labor, but also to put third parties who may want to acquire an interest in the properties at issue on notice of a claim for debt and a lien to secure that debt." *Endeavor Energy Res., L.P. v. Staley*, 569 S.W.3d 319, 325 (Tex. App. 2019) (citations omitted).

"Texas courts have repeatedly noted that the mineral lien statute is 'designed to protect laborers and materialmen' and should therefore be liberally construed." *In re Heritage Consol., L.L.C.*, 765 F.3d 507, 511–12 (5th Cir. 2014) (citing *Bandera Drilling Co., Inc. v. Lavino,* 824 S.W.2d 782, 784 (Tex. App.–Eastland 1992, no writ); *see also Youngstown Sheet & Tube Co. v. Lucey Prods. Co.,* 403 F.2d 135, 143 (5th Cir. 1968) (footnote omitted)). Liberal construction does not mean that a court may ignore the plain language of a statute, however:

> In this context, giving "liberal construction" means "to give the language of a statutory provision, freely and consciously, its commonly, its commonly, generally accepted meaning, to the end that the most comprehensive application thereof may be accorded, without doing violence to any of its terms." *Wesco Distrib., Inc. v. Westport Group, Inc.,* 150 S.W.3d 553, 557 (Tex. App. 2004) (citing *Maryland Cas. Co. v. Smith,* 40 S.W.2d 913, 914 (Tex. Civ. App. 1931)).
>
> Here, reading the provisions of § 56.041 that a mineral lien claim must be enforced "in the same manner" as liens under Chapter 53 to include both the duties required of *and* the rights granted to mechanics'/materialmens' lien claimants gives those provisions their most comprehensive application without nullifying or conflicting with other statutory provisions. *See Wesco Distrib.,* 150 S.W.3d at 560 (construction that deletes express provisions from statute does violence to its terms).

*In re Cornerstone E & P Co., L.P.*, 435 B.R. 390, 416 (Bankr. N.D. Tex. 2010).

Thus, the Court must begin with the plain language of the statute and may only apply liberal construction where the statute is silent. The Court will focus on two statutes: § 56.003, which defines the property subject to the lien, and § 56.022, which sets out the requirements for the claimant's affidavit in order to establish a valid lien.

Section 56.003 provides, in relevant part:

> (a) The following property is subject to the lien:
>
>> (1) the material, machinery, and supplies furnished or hauled by the lien claimant;
>>
>> (2) the land, leasehold, **oil or gas well**, water well, oil or gas pipeline and its right-of-way, and lease for oil and gas purposes for which the labor was performed or material, machinery, or supplies were furnished or hauled, and the buildings and appurtenances on this property;
>>
>> (3) other material, machinery, and supplies used for mineral activities and owned by the owner of the property listed in Subdivision (2); and
>>
>> (4) **other wells** and pipelines used in operations related to oil, gas, and minerals and located on property listed in Subdivision (2).

*Id*. (emphasis added)

Section 56.022 provides:

> (a) A lien claimant's affidavit must include:
>
>> (1) the name of the mineral property owner involved, if known;
>>
>> (2) the name and mailing address of the claimant;
>>
>> (3) the dates of performance or furnishing;
>>
>> **(4) a description of the land, leasehold interest, pipeline, or pipeline right-of-way involved; and**
>>
>> **(5) an itemized list of amounts claimed.**

Tex. Prop. Code Ann. § 56.022(a) (emphasis added).

### 2. Do Case's Texas Liens Adequately Set Forth the Amounts Claimed?

For the same reasons set out above in connection with the Louisiana liens, the Court concludes that Case failed to satisfy the requirement that it include "an

25

itemized list of amounts claimed." Not only did Case fail to include any itemization or other explanation, but the amount asserted in each lien affidavit, $1,200,000.00, included work relating to property unrelated to the liened property at issue. Indeed, the lien affidavit even referred to the fact that the total amount referred to work performed "in connection with certain oil and gas lease[s], including specifically that certain lease upon which is located" the particular identified well. There is simply no information provided from which a third party could determine the actual amount of the lien to which Case might be entitled, or what that work might have entailed to even determine whether Case was entitled to assert a lien at all. Not only that but filing each lien in the amount of PADCO's *total* alleged liability to Case grossly overstated the amount of liability in the public record. The Court concludes that Case failed to meet the statutory requirement that it file "an itemized list of amounts claimed" under § 56.022(a)(5). This would be a sufficient basis to invalidate the liens under Texas law, but it is not the only ground.

### 3. Do Case's Texas Liens Adequately Describe the Property Subject to the Lien?

As noted above, all 35 of Case's liens are essentially identical except for the description of the property subject to the lien, and the identity of the operator or operators of each well. As to the 10 Texas liens, Case described the property subject to the lien solely by reference to a well name, as follows:

> **COUNTY: Robertson County, Texas**
> **WELL: RL Dodds Jr. 03 Well, Robertson County, Texas**
> **API #: 42-395-31599**
> **OPERATOR: COVEY PARK OPERATING, LLC**[23]

Section 56.022(a)(4) requires a lien claimant to include in the lien affidavit "a description of the land, leasehold interest, pipeline, or pipeline right-of-way involved." In *Reichmann*, the Southern District of Texas squarely addressed the issue of precisely what constitutes a sufficient description, surveying the relevant case law. The Court noted that although the Texas Supreme Court has not addressed the issue,

---

[23] *See* Case's Supplemental Opposition, pp. 13-14 (emphasis in original).

the El Paso Court of Appeals did so in *Trevor Rees–Jones, Trustee for Atkins Petroleum Corp. v. Trevor Rees–Jones, Trustee for Apache Services, Inc.*, 799 S.W.2d 463 (Tex. App. 1990), and "found the following three different methods for describing the lease were sufficient: (1) providing the date and place of recording of the oil and gas lease in the county records, (2) providing the section, block, survey name, and county for the lease, and (3) providing survey descriptions of the lease." *Reichmann*, 2009 WL 915280, at *3 (citing *Rees-Jones*, 799 S.W.2d at 467). The Court noted that the *Rees-Jones* court relied on three prior cases, *In re Mid–America Petroleum, Inc.*, 83 B.R. 937 (Bankr. N.D. Tex. 1988), *Continental Supply Co. v. Gillespie,* 269 S.W. 859 (Tex. Civ. 1925, no writ), and *Youngstown Sheet & Tube Co. v. Lucey Products Co.,* 403 F.2d 135 (5th Cir. 1968).

*Mid-America* is particularly relevant to this case because, as the *Reichmann* court summarized:

> the bankruptcy court considered whether certain Chapter 56 mineral lien affidavits provided a sufficient property description and decided they did not. *Mid–America,* 83 B.R. at 941. The lien affidavits filed by Jimsco, Inc. and S & S Applicators, Inc. described the property as "Taylor–Link West S/A Unit, Taylor–Link West Field, Bakersfield, Pecos County, Texas." *Id.* "The affidavit filed by SMC, Inc. described the property as MAP's [Mid–America Petroleum, Inc.] leasehold interest with improvements held by MAP under an oil and gas lease granted by the University of Texas and then listed the property as certain university wells, Pecos County, Texas." *Id.* The bankruptcy court stated in its opinion that the lien affidavit must contain "a description of the land or the lease" and concluded the lien affidavits were insufficient to adequately identify the property on which their lien was claimed because no legal description was given, and no reference was made to any lease on file which contained a legal description. *Id.* at 942. Citing to *Boots Builders, Inc. v. Hobson Air Conditioning, Inc.,* 11 B.R. 635 (Bankr.N.D.Tex.1981), the Bankruptcy Court reasoned "that the leasehold on which the particular work was done and the materials furnished should be described with particularity so that a party familiar with the locality can identify the premises to the exclusion of others." *Mid–America,* 83 B.R. at 491.

27

*Reichmann*, 2009 WL 915280, at *4. Thus, simply identifying the unit at issue was insufficient.

In *Youngstown*, the Fifth Circuit held, under a predecessor statute to Chapter 56, that the following description of the leasehold was sufficient: "Lease dated November 18, 1948, from P. L. Fuller, W. M. Fuller and Andrew P. Fuller, Lessors, recorded in Volume 50, Page 239, Oil and Gas Lease Records, Scurry County, Texas, and in Volume 51, Page 530, Deed Records of Kent County, Texas, insofar as said lease covers Section 498, Block 97, H & T C RR Co." 403 F.2d at 144. The Fifth Circuit contrasted this description against the *Gillespie* decision, in which the state court invalidated a lien based on the following description: "That the said drill pipe material was * * * to be used in developing for oil, and producing oil from, certain land, premises and leasehold of land in what is known as the Markham Oil Field, in Matagorda County, Tex., the description of which land and mineral lease thereon is not known to this affiant." *Id.*

The *Reichmann* court itself concluded that the lien affidavits before it "that attach either a plat and a Texas Railroad Commission Form W-1 . . . provide an adequate description of the applicable leases referenced in those documents and therefore satisfy § 56.022(a)(4)," 2009 WL 915280, at *4, because "[t]he plats and Form W–1s are created in the regular course of business by operators of oil and gas leases as required by the Texas Railroad Commission." *Id*. at *8.

The Court has reviewed the relevant case law, including the cases cited by the parties, and concludes that the *Reichmann* decision, which was affirmed by the Fifth Circuit, is an accurate statement of the law. Although a valid mineral lien under § 56.003(a) will cover not only the "land" and "leasehold" but also the "oil or gas well" on which the work was performed and "other wells and pipelines" located on the property, in order to actually obtain the lien, § 56.022 requires the claimant to do more than simply identify one well on the property that will be covered by the lien. By its plain terms, § 56.022(a)(4) requires the claimant to include in the lien affidavit "a description of the land, leasehold interest, pipeline, or pipeline right-of-way involved," and as the cases discussed above illustrate, that description has to be fairly

28

exact. Tellingly, Case has not cited to a single decision under § 56.022 or its predecessor statutes that has upheld a lien where the lien affidavit attempted to identify a lease by referring only to a well. Indeed, the *Mid-America* decision, which invalidated a lien because the lien affidavit only identified a unit in a particular field and county, strongly suggests that identifying only a well is insufficient.

Accordingly, the Court concludes that Case has failed to satisfy § 56.022(a)(4)'s requirement that the lien affidavit include "a description of the land, leasehold interest, pipeline, or pipeline right-of-way involved." This provides a second, independent basis for invalidating the Texas liens.

### 4. Case's Texas Liens Are Invalid for Two Reasons.

PADCO is entitled to summary judgment declaring all 10 Texas liens invalid as a matter of law because (i) the liens do not include an itemized list of amounts claimed as required by Tex. Prop. Code Ann. § 56.022(a)(5), and (ii) the liens do not adequately describe the lease and other property interests subject to the lien a required by Tex. Prop. Code Ann. § 56.022(a)(4).

## IV. Conclusion

For the above reasons, the Court concludes that the Plaintiffs are entitled to partial summary judgment declaring the 35 liens filed by Case in Louisiana and Texas invalid. PADCO shall submit a proposed judgment in conformity with the foregoing reasons within ten (10) days.